IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:13-CV-109-FL

| | |
|---|---|
| IESHIA L. MIDGETTE, )<br>Plaintiff, )<br>)<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN, )<br>Acting Commissioner of Social Security, )<br>)<br>Defendant. ) | **MEMORANDUM AND<br>RECOMMENDATION** |

This matter is before the court on the parties' cross motions for judgment on the pleadings [DE #24 & 26] pursuant to Fed. R. Civ. P. 12(c). Plaintiff Ieshia L. Midgette ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her application for supplemental security income ("SSI") under title XVI of the Social Security Act. The time for filing responsive briefs has expired, and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, the undersigned recommends denying Claimant's Motion for Judgment on the Pleadings, granting Defendant's Motion for Judgment on the Pleadings, and upholding the final decision of the Commissioner.

## STATEMENT OF THE CASE

Claimant protectively filed an application for SSI on February 16, 2011, alleging disability beginning January 1, 2010. (R. 44, 180, 192, 196-97.) Her claim was denied initially and upon reconsideration. (R. 116-20, 124-27.) A hearing before Administrative Law Judge Diana Myrick ("ALJ") was held on October 30, 2012, at which Claimant was represented by

counsel. (R. 39-77.) Diane Haller, an impartial vocational expert ("VE"), appeared and testified. (R. 67-77.) On December 14, 2012, the ALJ issued a decision denying Claimant's request for benefits. (R. 18-31.) On February 25, 2013, the Appeals Council denied Claimant's request for review. (R. 1-4.) Claimant then filed a complaint in this court seeking review of the now final administrative decision.

## STANDARD OF REVIEW

The scope of judicial review of a final agency decision denying disability benefits under the Social Security Act, 42 U.S.C. §§ 301 *et seq.*, ("Act') is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; [i]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)) (internal quotation marks and citation omitted) (alteration in original). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589) (internal quotation marks omitted) (first and second alterations in original). Rather, in conducting the "substantial evidence" inquiry, the court determines whether the Commissioner has considered all relevant evidence and sufficiently explained the weight accorded to the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

2

# DISABILITY EVALUATION PROCESS

In making a disability determination, the Commissioner utilizes a five-step evaluation process. The Commissioner asks, sequentially, whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1; (4) can perform the requirements of past work; and, if not, (5) based on the claimant's age, work experience and residual functional capacity can adjust to other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *Albright v. Comm'r of the Soc. Sec. Admin.*, 174 F.3d 473, 74 n.2 (4th Cir. 1999). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). At the fifth step, the burden shifts to the Commissioner to show that other work exists in the national economy that the claimant can perform. *Id*.

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The ALJ is required to incorporate into her written decision pertinent findings and conclusions based on the "special technique." 20 C.F.R. § 404.1520a(e)(3).

In this case, Claimant alleges that the ALJ committed reversible error by improperly finding Claimant's multiple sclerosis ("MS") to be non-severe and evaluating the medical opinion evidence of record. (Pl.'s Mem. Supp. Mot. J. Pleadings [DE #25] ("Pl.'s Mem.") at 1.)

3

Claimant specifically argues that her MS caused significant functional impairment and that the opinion evidence, when properly evaluated, requires a finding that Claimant is unable to work.

## FACTUAL HISTORY

### I. ALJ's Findings

Applying the above-described five-step, sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was not engaged in substantial gainful employment. (R. 20.) Next, the ALJ determined Claimant had the following severe impairments: "bipolar disorder, schizoaffective disorder, and attention deficit hyperactivity disorder." (R. 20.) However, at step three, the ALJ concluded that Claimant's impairments, considered in combination, were not severe enough to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 23-24.) Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild restriction in her activities of daily living, moderate difficulties in social functioning, concentration, persistence or pace, with no episodes of decompensation. (R. 23-24.)

Prior to proceeding to step four, the ALJ assessed Claimant's residual functional capacity ("RFC"), finding Claimant had the ability to perform "a full range of work at all exertional levels" with the following nonexertional limitations: claimant can understand, remember, and carry out simple instructions for two hours at a time during an eight-hour workday; claimant requires low stress non-production-rate work; and Claimant is limited to work that is not performed in direct contact with the public or in close proximity to co-workers. (R. 24-25.) The ALJ further clarified that Claimant cannot function as a member of a team, and any contact Claimant has with the public should be incidental and not a primary factor in performing the job.

(R. 24.) In making this assessment, the ALJ found Claimant's statements about her limitations not credible to the extent they were inconsistent with the RFC. (R. 25.)

At step four, the ALJ concluded Claimant has no past relevant work. (R. 30.) Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined there are jobs that exist in significant numbers in the national economy that Claimant can perform. (R. 30.) Specifically, the ALJ found that plaintiff could perform the requirements of representative occupations such as laundry worker, janitor, housekeeper, folder for laundry or dry cleaning, final assembler, lens inserter, and inspector/polisher of optical equipment. (R. 31.)

## II.  Claimant's Testimony

Claimant was twenty-one years old at the time of her administrative hearing. (R. 30-31.) She left school in the eighth grade, was home-tutored for several months, and returned to school in the ninth grade but dropped out after several weeks. (R. 401.) Claimant testified that she dropped out of school because the work became "too hard," and she would "get scared and could not answer." (R. 53-54.) Claimant has no past relevant work. (R. 30, 245, 261.) She has never lived independently or had a driver's license. (50, 54, 401.)

Claimant explained numerous medical conditions supporting her disability claim and her inability to work full-time. Claimant complained that she suffered from MS, severe (long-term) depression, ADHD, bi-polar disorder, and "psychophrenia." (R. 54, 56-57.) Claimant testified that she was receiving treatment from East Coast Psychiatric for her psychiatric issues and East Carolina Neurology for her MS. (R. 55-56.) Claimant testified that many of her problems, including her depression, began when she was physically and sexually abused as a child. (R. 57.) Claimant reported that she stayed at Wayne Memorial Hospital in 2011 because she felt like she

5

was going to commit suicide. (R. 56.) Claimant stated that she was taking medications for her severe depression, ADHD, bi-polar disorder, and "psychophrenia," and that the medications help but she still has suicidal thoughts. (R. 56.) Claimant testified that she had lost weight and was not eating much because she has stomach problems. (R. 58.) Claimant also stated that she has nightmares regularly and has some trouble sleeping at night, but reported sleeping five or six hours at night then going back to sleep. (R. 58-59.)

Claimant reported that she was diagnosed with MS in January 2010 and that it causes: numbness in thirty to thirty-five percent of her body, including her hands and legs; pain on a daily basis; weakness; and trouble with her back and neck. (R. 54, 66.) She reported taking ibuprofen, Vicodin, injections and infusions for the MS, but claimed these treatments were not really helping and she is therefore transferring to another doctor. (R. 66.) Claimant testified that she had trouble doing physical activity and that she could not lift anything heavy, as her back is injured. (R. 67.)

Claimant reported she lives with her mother. (R. 51.) Claimant testified that she has two children, ages seven and two years, and that she cares for them with the help of her mother and sister. (R. 51-52.) Claimant reported that "CPS" gave "supervision" of her two children to her mother because her mother called "CPS" and told them Claimant couldn't take care of her kids. (R. 63-64.)

Claimant stated that her typical daily activities include sitting around the house, lying in bed half of the day, watching her two-year-old son, and sleeping intermittently throughout the day. (R. 57, 59, 63, 67.) Claimant testified that she: spends most of the day alone with her two-year-old child; doesn't trust strangers; prefers to stay to herself; feels worthless; "snaps a lot"; generally feels weak; and her whole body aches. (R 59-61.) She claims that she does not assist

6

her mother with cooking or cleaning, as her mother does not expect her to work while in pain. (R. 59, 65.) Claimant reported she cannot focus on doing tasks for long and she gets frustrated and quits. (R. 65.) Claimant also stated that her mother and sister help her seven-year-old with his homework because her memory is fading and she has trouble reading. (R. 65.) When asked about her employment history, Claimant affirmed that she had earned approximately $800.00 in her lifetime. (R. 49-50.) Claimant testified that she had worked very few jobs and those were for short durations because she could not do the work. (R. 49-50, 54.) Claimant specifically stated that her "body wasn't up for it and mentally [she] wasn't up for it" and she would get "frustrated and anxious." (R. 49-50, 54.) Claimant testified that during her employment she was unable to complete the work, do the work correctly, and was missing too many days due to sickness. (R. 49, 55.)

### III. Vocational Expert's Testimony

Diane Haller testified as a VE at the administrative hearing. (R. 67.) Claimant had no relevant work history for which the VE could provide testimony (R. 68), so the ALJ asked the VE to identify jobs that an individual with the following capabilities and limitations could perform: (1) no exertional limitations; (2) capable of understanding, remembering, and carrying out short, simple instructions for two hours at a time, eight hours a day, in a low-stress, non-production-rate job; (3) cannot work in close proximity to others or as a member of a team; and (4) cannot work in direct contact with the public, and any contact with public must be incidental and not a primary factor in the job. (R. 68.) The VE provided the following response:

> Such an individual would be able to work as a laundry worker. It is medium, unskilled work, the SVP is two, DOT number is 361. 361.685-018. The number of jobs nationally is about 185,000, there will be at least 1700 of these jobs in the [S]tate of North Carolina. Such an individual would be able to work as a janitor. It is medium unskilled work, the SVP is two, DOT number is 381.687-034. There are about 190,000 total jobs in

7

the United States, there will be at least 1700 of these jobs in the [S]tate of North Carolina and I will specify that this particular janitor job is usually performed at night, it involves cleaning floors. . . . Such an individual can work as a housekeeper, which is light unskilled work, SVP is two, the DOT number is 323.687-014. There will be about 270,000 jobs nationally at the light level, in the [S]tate of North Carolina there'll be about 4,000 jobs. Such an individual can work as a folder for laundry or dry cleaning services, it is light work and unskilled with an SVP of two, the DOT number is 369.687-018. There [are] about 80,000 jobs nationally . . . [and] about 1,000 jobs in the [S]tate of North Carolina. . . .

. . . .

. . . [At the sedentary level] [t]here will be small product assembly jobs that such an individual can perform. . . . [including] the job of final assembler, sedentary work, unskilled, SVP of two, DOT number 713.687-018. . . . a lens inserter, sedentary work, unskilled, SVP of two, DOT number 713.687-026. The number of sedentary bench work assembly job nationally will be about 75,000, and the number of jobs in the [S]tate of North Carolina will be about 1100. . . .

. . . .

. . . [T]here will also be some inspecting and packing type of jobs that can be performed. The DOT title inspector and polisher of optical equipment is classified as sedentary, unskilled, SVP of two, the DOT number is 713.684-038. The number of jobs nationally will be about 55,000, number of jobs in the [S]tate of North Carolina will be about 700.

(R. 69-71.) The VE further testified that the foregoing jobs are simple and do not require more than limited judgment. (R. 71.)

## DISCUSSION

### I. Claimant's Multiple Sclerosis

Claimant contends that the ALJ committed reversible error by finding Claimant's MS to be a non-severe impairment at step two of the sequential evaluation process. A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities," regardless of age, education, and work experience. 20 C.F.R. § 416.920(c). On the other hand, an impairment or combination of impairments is not severe if it does not

8

significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 416.921(a); *see also Titles II & XVI: The Sequential Evaluation Process*, 1983-1991 Soc. Sec. Rep. Serv. 423 (S.S.A 1986) (stating that an "impairment is not severe if it is a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on the individual's physical or mental abilities to perform basic work activities"). Diagnosis of a potentially disabling impairment does not show that an impairment is "severe," there must be a showing of significant, related functional loss for the period adjudicated. *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citing *Sitar v. Schweiker*, 671 F.2d 19, 20-21 (1st Cir. 1982)); *see also Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990) (finding that ALJ properly focused not on the claimant's diagnosis, but on the extent of claimant's actual functional limitations).

After fully considering the evidence concerning Claimant's MS, including the effects on her ability to function before and after her diagnosis, the ALJ found that there was no showing of significant, related functional impairment. Claimant first opposes the ALJ's finding by pointing to the MRI of her brain showing extensive bilateral white matter T2 signal abnormalities and her follow-up a few days later with Dr. John W. Gibbs at East Carolina Neurology, where he diagnosed her with MS. (R. 671.) Dr. Gibbs stated that Claimant had "significant bihemispheric white matter disease" and that, given the "aggressiveness" of her disease, he was recommending the "more potent agent," Gileynya, instead of the normal course of treatment. (R. 670.) However, Dr. Gibbs noted that there was no abnormal enhancement on the MRI to suggest active demyelination. (R. 672.) Claimant told Dr. Gibbs that her symptoms, including decreased sensation in her left leg, diffuse pain and weakness all over her body, and blurry vision in her right eye, started six months ago and progressively worsened. (R. 671.) On physical examination,

9

Dr. Gibbs reported that Claimant was comfortable, in no acute stress, had normal attention span and concentration, and normal limits, including awareness of current events, past history, and vocabulary. (R. 670.) Dr. Gibbs also reported that Claimant's extraocular muscles were intact bilaterally; vision was 20/20 bilaterally; there was no pronator drift; there was normal muscle bulk and tone in the extremities; 5/5 strength in extremities; intact sensation except left lower extremity below the knee; normal reflexes; normal heel and toe walking; and normal gait. (R. 670.) These findings show that Claimant's potentially limiting diagnosis of MS, as "aggressive" and "significant" as it was described by Dr. Gibbs, simply had not yet translated into any significant, related functional loss. Therefore, the ALJ's determination that Claimant had no significant, related functional loss at that time is supported by substantial evidence.

Next, Claimant contends that the ALJ did not properly consider her functional limitations following her MS diagnosis. Claimant points to her hospital visit in July 2012 where her chief complaints were fatigue and weakness. (R. 799.) However, Claimant's physical examination was largely unremarkable with no acute distress and no deficits appreciated. (R. 799.) Claimant was diagnosed with "mild dehydration," given fluids, and sent home. (R. 799.) MS was not mentioned in the examining physician's report. (R. 799.) Claimant visited the hospital again in August 2012, where she complained of body aches and weakness. (R. 757.) Physical examination revealed no significant restriction, and the physician noted Claimant "certainly does not have any weakness on examination that would prompt an admission or computed tomography scan or other workup." (R. 757-58.) The examining physician also noted that Claimant was "unable to describe her pain, except to say that it hurts all over and that it is 'bad.'" (R. 757.) Claimant was released after reporting significant improvement upon receiving IV fluids. (R. 758.) The examining physician merely noted "history of MS" under clinical

10

impression. (R. 758.) Two weeks later, Claimant returned to East Carolina Neurology for a follow-up visit with complaints of blurry vision and numbness in both hands and below the knees. (R. 681.) However, Claimant's neurologic examination was normal. (R. 682.) Lastly, although the results of the August 2012 MRIs presented subtle patchy abnormal T2 weighted signal which "may correlate with demyelinating plaques" from MS, Dr. Gibbs noted (and the ALJ pointed out) that there was no "enhancement to indicate active demyelinating plaque." (R. 690.) Based on the foregoing, substantial evidence supports the ALJ's finding that Claimant's "fairly recent diagnosis" of MS has not been shown to result in any significant functional impairment. (R. 21.)

Finally, Claimant contends that the ALJ erred in assessing the impact of Claimant's MS by relying on examinations and reports of activities that occurred long before Claimant's MS diagnosis. The undersigned disagrees.

The record does not demonstrate that Claimant had significant loss in related functioning during the period surrounding her diagnosis of MS. For example, Claimant's physical examination in May 2011 was normal, and the consulting physician did not note any physical limitations. (R. 29, 418.) While Claimant alleged new symptoms in the months leading up to her diagnosis of MS, as discussed above, these changes did not translate into significant functional loss. Furthermore, Claimant's admission that she had been suffering from the effects of MS for six months before her diagnosis undercuts her argument that there was a significant change in her limitations immediately preceding her diagnosis. (R. 671.) Therefore, the undersigned finds that the ALJ did not err to the extent she relied on examinations and records prior to Claimant's diagnosis of MS.

Despite Claimant's alleged limitations, the objective medical evidence of record does not demonstrate significant loss of function caused by MS. Therefore, the ALJ's determination that Claimant's MS is a non-severe impairment is in compliance with governing law and is supported by substantial evidence.

## II. Medical Opinion Evidence

Claimant contends that the ALJ erred by improperly evaluating the medical opinion evidence. (Pl.'s Mem. at 9.) The undersigned disagrees.

### a. Dr. Anthony Campagna

Claimant asserts that the ALJ erred by giving little weight to Dr. Campagna's opinion, including Dr. Campagna's finding that Claimant's highest global assessment of functioning ("GAF") rating in one year was 45.[1] (Pl.'s Mem. at 9.) Claimant was evaluated by Dr. Campagna as part of a consultative mental status examination on April 28, 2010. (R. 400.) Dr. Campagna provided a diagnosis of major depressive disorder with psychosis and post-traumatic stress disorder ("PTSD"). (R. 402.) Dr. Campagna opined that these disorders may be expected to cause Claimant to have markedly reduced ability to recall and carry out even the simplest instructions; marked difficulty responding appropriately to supervisors, coworkers, and the public; marked impairment of her concentration, attention, and work pace; and markedly reduced

---

[1] GAF is used by mental health professionals to rate an individual's level of social, occupational, and psychological functioning, and is found at Axis V of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV). The GAF score represents a practitioner's subjective assessment of the patient's functional capacities for the preceding 12 months along a hypothetical continuum of mental illness ranging from 1-100, with 100 being the highest level of functioning. The Social Security Administration has not endorsed the GAF scale for use in Social Security and SSI disability claims, as GAF scores do not have a direct correlation to the severity requirements for Social Security mental disorder listings. *See* 65 Fed. Reg. 50746, 50764-65, 2000 WL 1173632 (Aug. 21, 2000). However, a GAF score can still be of assistance to an administrative law judge in formulating a claimant's residual functional capacity.

Case 4:13-cv-00109-FL   Document 30   Filed 06/12/14   Page 12 of 19

ability to withstand the stress of a routine workday and adapt to workplace changes (R. 402.) Claimant notes that Dr. Campagna's assignment of a GAF of 45 indicates "serious symptoms." *See Diagnostic and Statistical Manual of Mental Disorders*, at 32 (4th ed. Text Rev. 2000) ("DSM-IV-TR").[2]

In her decision, the ALJ explained that her assignment of little weight to Dr. Campagna's opinion is supported by subsequent evidence of record, including treating sources and the examination by Dr. Asha Kohli, showing Claimant had a "greater degree of functionality." (R. 29.) The ALJ specifically noted that both Dr. Joanna Wolicki-Shannon (Claimant's treating psychiatrist) and Dr. Kohli subsequently rated Claimant's GAF to be 60, which is at the "borderline of mild to moderate symptoms or functional impairment." (R. 28, 410.) *See DSM-IV-TR* at 32. Claimant fails to address how the ALJ erred by relying on these opinions to discount the inconsistent opinion of Dr. Campagna. (R. 410.) Based on the foregoing, substantial evidence supports the ALJ's assignment of little weight to Dr. Campagna's opinion.

### b. Dr. Joanna Wolicki-Shannon

Claimant contends that the ALJ erred by assigning "little weight" to the opinion of Dr. Wolicki-Shannon, a treating psychiatrist, that Claimant appeared to be unable to engage in any meaningful employment. (R. 29, 410, 454, 676, Pl.'s Mem. at 11.) Generally, a treating physician's opinion should be accorded greater weight than the opinion of a non-treating physician's opinion, but the court is not required to give the testimony controlling weight in all circumstances. *Mastro*, 270 F.3d at 178. Rather, a treating physician's opinion on the nature and severity of a claimant's impairment is given controlling weight only if it is "supported by

---

[2] The Fifth Edition of the DSM published in 2013 has modified the multiaxial assessment system espoused by the DSM–IV, including discontinuing use of the GAF. *Diagnostic and Statistical Manual of Mental Disorders*, at 16 (5th ed. 2013).

13

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence on the record." *Id*; *see also* 20 C.F.R. § 404.1527(c)(2). "[B]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (quoting *Craig v. Chater*, 76 F.3d 585, 590 (1996)) (internal quotation marks omitted). Thus, the ALJ has the discretion to give less weight to the treating physician's testimony in the face of contrary evidence. *Id.* "Additionally, the ALJ is not bound by a treating physician's opinion regarding whether a claimant is disabled, as that opinion is reserved for the Commissioner." *Parker v. Astrue*, 792 F. Supp. 2d 886, 894 (E.D.N.C. 2011) (citing 20 C.F.R. § 404.1527(e)(1)).

Claimant specifically argues that Dr. Wolicki-Shannon's opinion was entitled to "great weight," absent "persuasive contradictory evidence," even if the opinion contained no functional limitations.[3] The ALJ explained that Dr. Wolicki-Shannon's opinion on the issue of whether Claimant is "disabled" or "unable to work" is not a medical opinion. (R. 29.) Rather, such a finding is an "administrative finding[] dispositive of a case, requiring familiarity with the [applicable] regulations and legal standards." (R. 29); *see also* 20 C.F.R. § 416.927(d) (providing that administrative findings that would direct the decision of disability, *e.g.*, a statement by a medical source that a claimant is "disabled" or "unable to work," are reserved to the Commissioner and are not entitled to any special significance, regardless of the source). Therefore, substantial evidence supports the ALJ's assignment of little weight to Dr. Wolicki-Shannon's opinion.

---

[3] Claimant cites the following cases in support of this argument: *Oppenheim v. Finch*, 495 F.2d 396 (4 Cir.1974); *Vitek v. Finch*, 438 F.2d 1157 (4 Cir.1971); *Mitchell v. Schweiker*, 699 F.2d 185 (4 Cir.1983).

14

### c. Dr. Asha Kohli

Claimant next asserts that the ALJ should have assigned more than "some weight" to Dr. Kohli's opinion that Claimant would be unable to tolerate the stress and pressures of day-to-day work activity. (R. 29, Pl.'s Mem. at 11.) Dr. Kohli, a consultative examiner, opined in April 2011 that Claimant was "able to understand, retain, and follow instructions"; "sustain attention to perform simple repetitive tasks"; would "have difficulty relating to others including fellow workers and supervisors"; and could not "tolerate the stress and pressure associated with day to day work activity because of mood swings and anger issues." (R. 426.) In her decision, the ALJ assigned Dr. Kohli's opinion "some weight," and accordingly, fashioned Claimant's RFC to include limitations to understanding, remembering, and carrying out simple instructions for two hours at a time; working in an area that is not in close proximity to co-workers; and working with no direct contact with the public. (R. 24, 29.) In response to Dr. Kohli's opinion that Claimant would not be able to tolerate day-to-day work activity, the ALJ explained that this concern is "adequately addressed by the residual functional capacity provision for a low stress non-production rate environment with limited social contact." (R. 29.)

Claimant cites SSR 85-15 for the proposition that the ALJ's RFC assessment, that Claimant is able perform in a "low stress" environment, is insufficient because people with mental impairments are often unable to deal with the stress of so-called "low stress jobs." (Pl.'s Mem. at 11.) This argument fails because SSR 85-15 was "not intended to set out any presumptive limitations for disorders, but to emphasize the importance of thoroughness in evaluation on an individualized basis." SSR 85-15, 1985 WL 56857, *5 (1985). The ALJ complied with SSR 85-15 by thoroughly evaluating Claimant's functional limitations resulting from her mental impairments. The ALJ specifically pointed to inconsistencies in Claimant's

15

reports to her treating providers regarding her mental impairments and Dr. Kohli's report that Claimant "seems to be exaggerating at times." (R. 28, 426.) Moreover, the ALJ found that Claimant's mental impairments were exacerbated by her non-compliance with treatment. Furthermore, Dr. Kohli noted, right after giving her opinion that Claimant could not tolerate workplace stress, that "medication and therapy can help." (R. 426.) In addition, two State agency physicians opined that Claimant was capable of completing simple tasks in a low-stress, low-demand environment that does not require social interaction. (R. 91, 112.) In this case, the ALJ's assignment of "great weight" to the opinions of the State agency consultants was warranted in light of Dr. Kohli's findings and the records showing improvement with medication and reports of Claimant's daily activities. (R. 30); *see also* SSR 96-6p, 1996 WL 374180, *3 ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."). Based on the foregoing, the ALJ's stress-tolerance finding and assessment of Dr. Kohli's opinion are supported by substantial evidence.

### d. Dr. Muhammad Bhatti

Claimant asserts that the ALJ erred in giving "little weight" to Dr. Bhatti's ultimate opinion concerning Claimant's inability to work due to mental limitations. (Pl.'s Mem. at 10.) Dr. Bhatti, a family medical physician, conducted a consultative examination of Claimant in May 2011. (R. 417-18.) On physical examination, Dr. Bhatti found that Claimant had no significant functional limitations. Specifically, Claimant's grip strength was normal at 5/5 bilaterally; dexterity was normal; ability to pinch, grasp, and manipulate small and large objects was within normal limits; gait was normal and sustained; and Claimant was able to stand on her toes and bend over and touch her toes without difficulty. (R. 418.) With respect to Claimant's mental

health, Dr. Bhatti found that Claimant was "depressed and minimally verbal" and was recently diagnosed with ADHD and schizoaffective disorder, which led him to conclude that, "looking at the overall picture, she does not appear to be able to work at this time." (R. 418-19.) The ALJ assigned "great weight" to the extensive physical examination by Dr. Bhatti, particularly as it reveals no significant functional limitations, but "little weight" to his ultimate opinion concerning Claimant's inability to work due to mental limitations. (R. 29.) The ALJ explained that she assigned "little weight" to Dr. Bhatti's opinion regarding Claimant's mental limitations because Dr. Bhatti is not a psychiatrist and his opinion was based on one medical chart and Claimant's subjective allegations. (R. 29.)

Substantial evidence supports the ALJ's determination that Dr. Bhatti's opinion was misplaced to the extent he relied on Claimant's subjective allegations because, as discussed above, Claimant was deemed not entirely credible, and Claimant lodges no specific argument to the contrary. (R. 25.) Moreover, the "overall picture" on which Dr. Bhatti based his opinion of Claimant's mental impairment was, by his own admission, limited to "one emergency department short report . . . indicating patient's history of depression and anxiety" and Claimant's self-report, though he described her as a "very poor historian." (R. 417.) Furthermore, Dr. Bhatti's physical findings were based on a detailed physical examination, but his mental findings were not based on any mental status tests. Rather, Dr. Bhatti merely relied on his observation that Claimant was "depressed and minimally verbal." For these reasons, substantial evidence supports the ALJ's apportionment of weight to Dr. Bhatti's opinion.

### e. Dr. Ambrose Okonkwo

Claimant asserts that the ALJ's treatment of the opinion of Dr. Okonkwo, a treating physician, constitutes "plain error." (Pl.'s Mem. at 11.) Dr. Okonkwo wrote a letter in October

17

2012 opining that Claimant feels "depressed and confused most of the time due to her *disabling medical condition*" and that she was "totally and permanently *disabled* due to her schizophrenia and MS." (R. 891 (emphasis added).) Although the ALJ referenced Dr. Okonkwo's opinion in her decision, she did not assign it specific weight. (R. 22.) If an ALJ determines that a treating physician's opinion is not entitled to controlling weight, she must then determine the weight to be given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2)–(5); *see also Parker*, 792 F. Supp. 2d at 894. Assuming the ALJ erred by not explicitly weighing Dr. Okonkwo's opinion, it was harmless error. *Lee v. Sullivan*, 945 F.2d 687, 692-693 (4th Cir. 1991); *see also Morgan v. Barnhart*, 142 F. App'x 716, 726 (4th Cir. 2005) (recognizing the harmless error doctrine within the social security context).

In this case, the ALJ clearly addresses and discounts Dr. Okonkwo's opinion in her decision. (R. 18-31.) First, with respect to Dr. Okonkwo's opinion of Claimant's MS, the ALJ considered all of the evidence relevant to Claimant's MS and gave many reasons for finding it to be non-severe, which clearly shows her disagreement with Dr. Okonkwo's opinion. (R. 20-21.) Second, Dr. Okonkwo's conclusion that Claimant is "disabled" due to her mental condition, like Dr. Wolicki-Shannon's opinion that Claimant was unable to engage in any meaningful employment due to her mental impairments, is not a medical opinion, but an administrative finding. *See* 20 C.F.R. § 416.927(d). Because Dr. Okonkwo's findings, if given controlling weight, would direct the decision of disability, they are not entitled to any special significance, even though they are the opinions of a treating physician. *See* 20 C.F.R. § 416.927(d). Therefore, Claimant fails to show any harm arising from the ALJ's failure to explicitly weigh Dr. Okonkwo's opinion.

18

## CONCLUSION

For the reasons stated above, the undersigned RECOMMENDS that Claimant's Motion for Judgment on the Pleadings [DE #24] be DENIED, Defendant's Motion for Judgment on the Pleadings [DE #26] be GRANTED and the final decision of the Commissioner be AFFIRMED.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have fourteen (14) days from the date of service to file written objections. Failure to file timely, written objections shall bar an aggrieved party from receiving de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Judge.

This 12th day of June 2014.

_____
KIMBERLY A. SWANK
United States Magistrate Judge